IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2014 MAY -1  PM 1: 39

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____KWC
DEPUTY

UNITED STATES OF AMERICA

-vs-                                                        CAUSE NO.  A-11-CR-411-SS

JOHN JOSEPH DIMEGLIO

---

# O R D E R

BE IT REMEMBERED on this day, the Court reviewed the file in the above-styled cause, and specifically Plaintiff United States of America's Motion for Summary Judgment [#107], and Intervenor Mark Francis's "Answer" [#113]; Plaintiff United States of America's Motion to Dismiss [#110], and Intervenor Francis's "Answer" [#114]; and Intervenor Francis's Motion for Final Summary Judgment [#111], and Plaintiff United States of America's Response [#115].  Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

## Background

This dispute centers around Plaintiff United States of America (the Government)'s attempt to garnish a promissory note in connection with a restitution judgment against Defendant John Joseph Dimeglio, and Intervenor Mark Francis's attempt to resist the garnishment because he claims an interest in the promissory note.  For the reasons described in this order, the Court finds the Government is entitled to judgment, the Government's lien attaches to the promissory note, and Francis's claims must be dismissed for failure to establish an interest in the promissory note.

On November 22, 2011, this Court sentenced Dimeglio to 60 months imprisonment, ordered him to pay a fine of $3,600, and ordered him to pay restitution to 278 victims, jointly and severally with Defendant Kurt Barton, for his role in a fraudulent investment scheme involving Triton Financial and its subsidiaries. *See* Judgment [#21]. On January 9, 2012, the Court entered an amended judgment establishing the amount of restitution at $62,067,792.77. *See* Amended Judgment [#23]. Pursuant to the Mandatory Victim Restitution Act (MVRA), a lien statutorily arose upon entry of judgment against all property Dimeglio owns or in which he has an interest. *See* 18 U.S.C. § 3613(c).

On May 21, 2012, the Government initiated an enforcement proceeding pursuant to the Federal Debt Collection Procedure Act (FDCPA), 28 U.S.C. § 3001, *et seq.*, to collect on this debt. Specifically, the Government seeks to garnish a promissory note from Bridgepoint Ventures, LLC (the Bridgepoint Note), payable to Oak Creek Realty Fund-II, LLC (Oak Creek II), for the sale of the property located at 7310 South Congress Avenue, Austin, Texas 78745 (the Congress Property). *See* Answer of the Garnishee [#38]. In its answer, Garnishee Bridgepoint Ventures attested Dimeglio maintains an interest in the Bridgepoint Note, which has an approximate value of $324,090.00 and monthly mortgage payments of $1,739.79. *Id.*

On July 16, 2012, Dimeglio objected to the garnishment, claiming he did not have an interest in the Bridgepoint Note. *See* Response to Application for Writ of Garnishment [#51]. Dimeglio contended he was the general partner of Oak Creek II, but there were numerous limited partners who actually owned the note. *Id.* In a letter attached to his Response, Dimeglio elaborated and explained Oak Creek Property Management, Inc. (Oak Creek Management) is the "manager" of the Oak Creek II fund, and Dimeglio is the sole owner of Oak Creek Management, an entity Dimeglio asserts is now

defunct with no assets. *Id.* He also filed a Request for Hearing [#52]. On October 25, 2012, Dimeglio withdrew his request for a hearing. *See* Letter Withdrawing Request for Hearing [#68].

Oak Creek II investor Mark Francis intervened in this garnishment proceeding on behalf of the Francis Family Trust, asserting the trust has a $115,000 ownership interest in the Bridgepoint Note pursuant to its agreement with Oak Creek II as one of the limited partners. *See* Motion to Intervene [#69].

## Analysis

### I.      Cross Motions for Summary Judgment

### A.      Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

**B.    The Government's Motion for Summary Judgment**

In short, the Government seeks to collect on the restitution judgment against Dimeglio by utilizing veil-piercing doctrines to establish the Bridgepoint Note is subject to garnishment under the theory that Oak Creek II and Dimeglio are one and the same. In other words, the Government contends that Oak Creek II is the payee under the Bridgepoint Note, and since Oak Creek II is

Dimeglio's alter ego, the proceeds of the Bridgepoint Note should be subject to garnishment and directed towards satisfaction of Dimeglio's restitution debt. The Government seeks to collect this debt in order to restore victims of the fraudulent investor schemes Dimeglio and others—most notably Kurt Barton—perpetrated through various financial entities, including Triton Financial as well as Oak Creek II.

Intervenor Francis opposes summary judgment, arguing Dimeglio does not have an ownership or property interest in Oak Creek II, and it is actually the limited partners of Oak II, including Francis, who actually own Oak Creek II and who are entitled to the proceeds of the Bridgepoint Note.

### 1.    The Government has the Authority to Enforce the Restitution Debt

As an initial matter, the parties do not disagree that the United States Congress charged the Attorney General with the responsibility for collecting any unpaid fines or restitution ordered by United States District Courts as part of a defendant's sentence. *See* 18 U.S.C. § 3612(c). The FDCPA, 28 U.S.C. §§ 3001–3308, sets out the procedures by which the United States may recover on a civil or criminal judgment. The FDCPA provides in relevant part: "a court may issue a writ of garnishment against property in which the debtor has a substantial nonexempt interest and which is in the possession, custody, or control of a person other than the debtor, in order to satisfy the judgment against the debtor." 28 U.S.C. § 3205(a). "Co-owned property shall be subject to garnishment to the same extent as co-owned property is subject to garnishment under the law of the State in which such property is located." *Id.* Property is denied as "any present or future interest, whether legal or equitable, in real, personal (including choses in action), or mixed property, tangible or intangible, vested or contingent, wherever located and however held." 28 U.S.C. § 3002(12).

**2.     The Government's Lien Attached to Defendant's Property or Property Rights**

The parties also do not disagree that as part of Dimeglio's criminal conviction, he was ordered to pay restitution to his victims under the MVRA, and upon his sentencing on November 22, 2011, a lien, akin to a federal tax lien, arose and was automatically and statutorily imposed on all of Dimeglio's property for collection of the outstanding restitution. *See* 18 U.S.C. § 3613(c). Congress intended federal tax liens "to reach every interest in property a taxpayer may have." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719–20 (1985). A federal tax lien may reach a taxpayer's interest in "property or rights to property" to the extent applicable state law recognizes the subject interest as property. *Id.* at 722; *see also United States v. Decay*, 620 F.3d 534, 539 (5th Cir. 2010).

**3.     The Bridgepoint Note is Subject to the Government's Lien**

The parties do disagree, however, as to whether the Bridgepoint Note is subject to the Government's lien. More specifically, the issue is whether Dimeglio has a property interest in the Bridgepoint Note. State law determines the extent of a debtor's interest in property, and federal law determines the consequences of such property interest. *Drye v. United States*, 528 U.S. 49, 58 (1999). The property at issue is located in Texas where Oak Creek II conducted business. Therefore, the Court applies Texas law to determine the extent of Dimeglio's interest. The Government relies on a reverse veil-piercing theory to contend Dimeglio has a property interest in the Bridgepoint Note.

**a.     Veil-Piercing and Reverse Veil-Piercing in Texas**

Piercing the corporate veil is a common law means of imposing liability. *Wilson v. Davis*, 305 S.W.3d 57, 68 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Courts disregard the corporate fiction in the following instances:

(1)    when the fiction is used as a means of perpetrating fraud;

(2)    where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3)    where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4)    where the corporate fiction is employed to achieve or perpetrate monopoly;

(5)    where the corporate fiction is used to circumvent a statute; and

(6)    where the corporate fiction is relied upon as a protection of crime or to justify wrong.

*Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986); *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 244 (5th Cir. 1990). The legal fiction between an individual and an entity may be pierced if the entity "has been used as part of a basically unfair device to achieve an inequitable result." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2009); *W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994) (internal citation omitted).

Disregarding the corporate fiction on any of the six bases identified above is an equitable doctrine with a flexible, fact-specific approach focusing on equity. *Castleberry*, 721 S.W.2d at 273. Each of the bases for disregarding the corporate form involves some type of wrongdoing, injustice, or inequity. *Wilson*, 305 S.W.3d at 69. "Injustice" and "inequity" mean the types of abuse the corporate structure should not shield—fraud, evasion of existing obligations, criminal conduct, and the like. *Id.* (internal quotation omitted). Although "the relationship between two entities" is one consideration to disregarding the corporate form, "[t]he other consideration is whether the entities' use of limited liability was illegitimate." *Id.* (internal quotation omitted).

Under Texas law, reverse-piercing, or holding a corporation's assets accountable for the liability of the individual, is accomplished through the alter ego theory. *Zahra Spiritual Trust*, 910 F.2d at 243–44. The ultimate goal in a reverse piercing case is unique; rather than merely disregarding the corporate fiction and holding the shareholders accountable, the court treats the invidual and corporation as "one and the same." *Id.* Upon a sufficient showing "that the corporation is alter ego of the debtor, the corporation is treated as the debtor and its property may be attached . . . ." *Id.* at 244. The alter ego theory of liability occurs when a corporation is organized and operated as a mere tool or business conduit of another. *Castleberry*, 721 S.W.2d at 272. Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased. *Id.* "An alter ego relationship may be shown from the *total* dealings of the corporation and the individual." *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990) (emphasis in original). This showing may include evidence of: (1) the degree to which corporate formalities have been followed and corporate and individual property have been kept separately; (2) the amount of financial interest, ownership, and control the individual maintains over the corporation; and (3) whether the corporation has been used for personal purposes. *Id.* The presence of an alter ego relationship is a question of fact. *Castleberry*, 721 S.W.2d at 277. Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the "alter egos" owns stock in the corporation. *Zahra Spiritual Trust*, 910 F.2d at 245.

**b.    LLCs and Applicability of Veil-Piercing Doctrines**

Unlike a corporation, a limited liability company (LLC) does not have shareholders, but rather has members.  An LLC must have at least one member.  CAL. CORP. CODE § 17050[1]; TEX. BUS. ORGS. CODE § 101.101.  A membership interest and an economic interest in an LLC is personal property. TEX. BUS. ORGS. CODE § 101.106.  Under Texas law, foreign LLCs are required to register with the Texas Secretary of State to transact business in the state.  *Id.* § 9.001.

While veil-piercing doctrines have traditionally been applied to corporations, Texas courts have extended these principles to LLCs.  *See Shook v. Walden*, 368 S.W.3d 604, 611–13 (Tex. App.—Austin 2012, pet. denied) (discussing legal evolution of corporate veil-piercing doctrines and emergence of LLC's); *see also McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 589–90 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).  The veil of an LLC may be pierced upon proof the defendant used the LLC to perpetrate actual fraud for the defendant's direct personal benefit. *Shook*, 368 S.W.3d at 607.  Actual fraud means "that involving dishonesty of purpose or intent to deceive." *Id.* at 622 (citing *Castleberry*, 721 S.W.2d at 273).

**c.    Application of Veil-Piercing to Dimeglio and Oak Creek II**

The summary judgment evidence, which is extensive and almost exclusively provided by the Government, establishes Oak Creek II was Dimeglio's alter ego based on consideration of the total dealings of Oak Creek II, Dimeglio, and Oak Creek Management.  The record shows, among other things: (1) Oak Creek II was run exclusively by its "Managing Member," Oak Creek Management;

---

[1]Oak Creek II was organized in California.  Therefore, California law governs its formation, but it does not determine Dimeglio's property interest.  This interest is determined by the law of the state in which the property is located.  *See* 28 U.S.C. § 3205(a) and 28 U.S.C. § 3002(12).  The Congress Property, which is the basis for the Bridgepoint Note, and the payor of the note are both located in Austin, Texas.

(2) Oak Creek Management was solely owned and operated by Dimeglio, meaning Dimeglio was, in effect, the "Managing Member" with exclusive control over Oak Creek II; (3) Dimeglio used Oak Creek II as a tool and business conduit to perpetrate his fraud on investors; (4) Dimeglio and Oak Creek II were one and the same; (5) Oak Creek II's property and Dimeglio's property were commingled and Dimeglio used Oak Creek II for personal purposes; and (6) Dimeglio had significant financial interest, ownership, and control over Oak Creek II.

### i.    Dimeglio's Use of Oak Creek II as a Tool and Business Conduit

Dimeglio used Oak Creek II to attract investors and defraud them.  In short, Dimeglio solicited wealthy investors to purchase "units" in Oak Creek II in exchange for high yield returns. *See* Pl.'s Mot. Summ. J. [#107-3], Ex. 26 (Confidential Private Placement Memorandum or CPP Memo) (memorandum sent to potential investors describing Oak Creek II, its structure, and supposed purpose). Oak Creek II would own, operate, repair, and then sell real estate for a profit. *Id.* at 6. Through paid salespeople and advertisements, Dimeglio offered to sell 1,000 "units" for $1,000 each, which would amount to a total of $1,000,000, and he was successful in his recruitment as forty-five people bought units in Oak Creek II, contributing a total of $975,000. *See id.* at 7; Pl.'s Mot. Summ. J. [#107-2], Ex. 15 (Meskill Decl.), ¶ 32 (declaration of financial investigator who documented the financial records of Oak Creek II).  These investors received back small distributions, but they were minimal compared to the total investment and anticipated returns. *See* CPP Memo, at 8, 15; Meskill Decl., ¶ 33.

In the CPP Memo distributed by Dimeglio to potential investors, he represented that $175,000, or 17.5%, was estimated for "management fees," which included the costs of daily operations. CPP Memo, at 7. Within the first four years of Oak Creek II's operation, however, six

company individuals were paid at least $775,373, and Dimeglio decided these allocations. *See* Meskill Decl., ¶¶ 25–30; Pl.'s Mot. Summ. J. [#107-3], Ex. 16 (McGavran-Martinez Decl.), ¶ 13. While the record does not show how much of the investors' money these company individuals spent, Intervenor Francis only appears to have received back about 10 percent of the amount invested and suffered substantial losses in the Oak Creek II operation, which later blended into the Triton scheme. *See* Judgment [#21], at 12 (listing the Francis Family Trust as one of Dimeglio's victims); Mot. to Intervene [#69], at 32.

Dimeglio further represented about $750,000, or 75%, of the total contribution would be used to acquire properties. CPP Memo, at 7. The record indicates it is essentially impossible to determine with any certainty what properties were purchased with what funds given many of them were financed and later "rolled over" into the Triton fraud years ago. *See* Pl.'s Mot. Summ. J. [#107-3], Ex. 71 (Kelly Decl.), ¶ 16. Nevertheless, the record does show Dimeglio used minimal, if any, Oak Creek II funds to purchase the Congress Property.[2] The Congress Property was purchased for $450,000. *See* Pl.'s Mot. Summ. J. [#107-3], Ex. 50. Of this amount, 70% was financed with a $315,000 loan. *See id.*, Exs. 50, 51. At least 9% and as much as 15% came from the Horowitzes, who were outside investors with no interest in Oak Creek II. *See id.*, Exs. 52, 53, 55; *see also id.*, Ex. 20 (Horowitz Decl.), ¶ 14. The Horowitzes had a direct 50% interest in the property. *See id.* The remaining 50% was eventually titled in Oak Creek II's name. *See id.*, Ex. 55. Accordingly, any

---

[2] The ownership history of the Congress Property is complicated, and the Court does not document all of the details in this order. The Court does note the Government has provided an exhaustive record—to the extent an exhaustive record is possible considering Dimeglio claims all of the Oak Creek II records were either lost or destroyed—of the Congress Property's ownership history in its Fact Appendix [#108], ¶¶ 87–98.

share Francis might have in the Congress Property would appear to be small compared to his investment.[3]

The summary judgment record shows Dimeglio used Oak Creek II to raise investor funds, but he did not use those funds as he represented he would.  Instead of using 75% of funds to purchase properties, he appears to have used most of the investor money to pay "management fees," and then used other sources of finance to purchase properties, including the Congress Property, which was purchased primarily through a loan and the Horowitzes.  Oak Creek II was merely a tool for Dimeglio's fraudulent scheme.

### ii.    Unity Between Dimeglio and Oak Creek II

There is also substantial evidence in the record demonstrating unity between Dimeglio and Oak Creek II in the sense they are "one and the same."  In 2003, Oak Creek Management was incorporated in California, and in 2007, a Statement of Information was filed naming Dimeglio as Chief Executive Officer, Secretary, Chief Financial Officer, director, and agent for service of process for Oak Creek Management.  *See* Pl.'s Mot. Summ. J. [#107-3], Exs. 35, 36.  In January 2004, the Articles of Incorporation were filed for Oak Creek II in California, and in 2007 and 2008, Statements of Information were filed naming Oak Creek Management as the manager of Oak Creek II and Dimeglio as the agent for service of process.  The type of business was described as "property holdings," and these forms were signed by "John Dimeglio, managing member."  *See id.*, Exs. 41,

---

[3]While there is no way to clearly calculate Francis's share or contribution due to the lack of record-keeping by Dimeglio and the fraudulent nature of Oak Creek II, one reasonable method would be as follows: $450,000 (purchase price) – $315,000 (loan) = $135,000.  Because Oak Creek II owned a 50% interest, its share was $135,000/2 = $67,500.  Francis owned roughly 11% of Oak Creek II, which suggests his share would amount to roughly $67,500 x 11% = $7,425.

22, 23. This structure was an attempt to insulate Dimeglio from liability while vesting him with complete control.

The record shows Dimeglio (via Oak Creek Management) exercised complete control over Oak Creek II; indeed, the operating agreement stripped any control from any of the investors. Specifically, the CPP Memo and the Operating Agreement include the following sampling of representations and agreements: (1) Dimeglio was the "Operating Principal" of the manager, Oak Creek Management, and would manage all aspects of Oak Creek II's business; (2) investors had no authority to make any investment decisions on behalf of Oak Creek II and had no "right to participate in the management of the Company's business and affairs"; (3) the "Managing Member" had the right to make "all" decisions and to act "without further notice to or consent from any other Member"; (4) the "Managing Member" was given an irrevocable power of attorney to file, record, and publish documents for Oak Creek II, and he could enter into property management contracts and hire contractors at his sole discretion. *See* CPP Memo, at 1, 12; Pl.'s Mot. Summ. J. [#107-3], Ex. 33 (Operating Agreement), at 12.

Dimeglio exclusively exercised this control over Oak Creek II and Oak Creek Management to the point actions he took as an individual and actions he took as a member of these two entities were indistinguishable. For instance, as described above, the Congress Property, at one time, was owned 50% by Oak Creek II and 50% by the Horowitzes. Eventually, Dimeglio forced the Horowitzes to sell their share, the property was refinanced, and all interests were conveyed to Oak Creek II. *See id.*, Horowitz Decl., ¶ 41; *id.*, Exs. 56, 57. When the loan on the Congress Property was refinanced, Franklin Bank required Dimeglio to *personally guarantee* the $155,000 refinance loan, which he did. *See* Pl.'s Mot. Summ. J. [#107-4], Exs. 57, 62.

While many of the Oak Creek II investors, including Francis, now state that Oak Creek Management was the manager of Oak Creek II, veil-piercing doctrines would equally apply to Oak Creek Management, which never issued any shares and which Dimeglio solely owned and controlled. *See id.*, Ex. 36. Illustrating the unity between Oak Creek Management and Dimeglio is the fact Dimeglio listed himself, not Oak Creek Management, on the Oak Creek II Statements of Information from 2007 and 2008 as the "Managing Member." *See id.*, Exs. 22, 23. Dimeglio and Oak Creek Management were one and the same just as Dimeglio and Oak Creek II were one and the same.

The summary judgment evidence shows whatever line existed between Oak Creek II (as well as its "Managing Member" Oak Creek Management) and Dimeglio was blurred beyond recognition.

### iii.    Separateness of Oak Creek II's Property and Dimeglio's Property and Dimeglio's Use of Oak Creek II for Personal Purposes

The summary judgment evidence indicates Oak Creek II's property and Dimeglio's property were not kept separate, and Dimeglio used Oak Creek II's property for personal purposes. For instance, after selling the Congress Property, some money from the sale went into Dimeglio's personal bank account. *See* Pl.'s Mot. Summ. J. [#107-4], Exs. 76, 77. While monthly mortgage payments on the Bridgepoint Note were deposited into an Oak Creek Management account on which Dimeglio was the signatory, Dimeglio directed Billy Higgins to send money from this Oak Creek Management account to Dimeglio's wife in Brazil. *See* Meskill Decl., ¶ 5; Pl.'s Mot. Summ. J. [#107-3], Ex. 19 (Higgins Decl.), ¶ 11. In addition, prior to the sale, Dimeglio lived in one of the apartments at the Congress Property, and there is no indication he paid any rent or otherwise reimbursed Oak Creek II for this expense. *See* Higgins Decl., ¶ 9.

### iv.    Dimeglio's Financial Interest, Ownership, and Control Over Oak Creek II

The summary judgment record is replete with evidence demonstrating Dimeglio's substantial financial interest, control, and essentially exclusive control over Oak Creek II. While Oak Creek II was structured to avoid naming Dimeglio as owner or affording him a direct interest in the company, he was, in effect, Oak Creek II's sole owner. The investors gave the "Manager," or Oak Creek Management, which was exclusively owned and operated by Dimeglio, complete power of attorney to act on their behalf. *See* Pl.'s Mot. Summ. J. [#107-3], Ex. 33 (Subscription Agreement with Power of Attorney), at 5, ¶ D; Operating Agreement, at 21. They retained no right to make decisions regarding Oak Creek II's operation. *See* CPP Memo, at 11–12. In short, the investors ceded absolute authority to Dimeglio presumably because they believed he would deliver high yield returns on their investment. Instead, Dimeglio defrauded them of thousands of dollars.

Dimeglio had a personal financial interest in Oak Creek II through his control of the "Manager," Oak Creek Management. The "Manager" was entitled to management fees, which perhaps explains the $162,775 distribution described above, and the "Manager" also had a 50% share of the profits. *See* CPP Memo, at 7, 9. Dimeglio also had the exclusive authority to make distributions to his management team. *See* Operating Agreement, at 15–16. While Oak Creek II raised roughly $975,000, Dimeglio distributed $775,373 from 2004 to 2007 to six company individuals: (1) Dimeglio (the principal—$162,775); Sunny Kohli (salesman—$253,110); (3) Linda Martinez (bookkeeper—$152,695); (4) Billy Higgins (repair man—$187,606); (5) Joshua Host (salesman—$9,485); and (6) Daniel Peace (salesman—$9,702). *See* Meskill Decl., ¶¶ 25–30. By comparison, the Francis Family Trust invested $110,000 and received distributions totaling $11,657 during this same time frame. *See* Mot. Intervene [#69], at 32. In total, the records demonstrate about

$107,234 in distributions were paid to the 45 investors over a four year period.  *See* Meskill Decl., ¶ 33.

The degree of Dimeglio's seemingly unchecked control over Oak Creek II was evident in Oak Creek II's transition into the Triton Scheme.  Oak Creek II first appeared in Texas in 2004, and it purchased five properties in Travis County from 2004 to 2011.  *See* Pl.'s Mot. Summ. J. [#107-3], Ex. 43, 1–2.  The LLC was not legally authorized to transact business in Texas until 2008 when it filed its registration.  *Id.*, Ex. 42.  Around 2005, Dimeglio connected with Kurt Barton, and the two began their joint venture, commingling Oak Creek II's assets with Triton's.  *See* Kelly Decl., ¶ 16.  Apparently Dimeglio stopped keeping separate records or has since destroyed them despite his obligation to maintain them.  *See* Operating Agreement, at 15; Pl.'s Mot. Summ. J. [#107-3], Ex. 48 (Dimeglio's Responses to USA's Requests for Production), at 1–6; *id.*, Ex. 28 (Dimeglio's Responses to USA's First Set of Interrogatories), at 1.  Triton's employees and addresses were depicted on Oak Creek II deeds.  *See id.*, Exs. 65, 67, 72.  Oak Creek II investors were rolled over into Triton assets and solicited for Triton investments.  Dimeglio shared his team from Oak Creek II, such as Billy Higgins, with Triton.  *See* Higgins Decl., ¶ 8.

On paper, Dimeglio was the "Operating Principal" of the "Manager" as well as the "Managing Member."  *See* Operating Agreement, at 2; CPP Memo, at 1, 2.  He was the only person with any authority to make decisions, including which properties to purchase, what repairs to make, and when to dispose of them.  *See* Operating Agreement, at 12.  He directed payments and distributions.  *See* CPP Memo, at 15; Operating Agreement, at 15.  He signed the deeds and loan documents.  *See* Pl.'s Mot. Summ. J. [#107-3], Ex. 62.  He decided whether to invest Oak Creek II properties in Triton.  *Id.*, Ex. 73.  He put those properties up as collateral for Triton's acquisitions.

*Id.*  He decided whether to enter into partnerships or joint ventures (CPP Memo, at 13), what contractors to hire (*id.*, at 1), when to request more capital (*id.*, at 2), and whether to admit additional investors (*id.*, at Cover 7–9).

Focusing more specifically on the Congress Property, Dimeglio's vast control is apparent. In August 2004, Billy Higgins purchased the Congress Property at Dimeglio's direction. *See* Higgins Decl., ¶ 4.  The purchase was financed primarily by a $315,000 loan and outside investor money from the Horowitzes who were not part of Oak Creek II. *See* Pl.'s Mot. Summ. J. [#107-3], Exs. 51, 52, 53.  Higgins eventually conveyed a 50% interest to the Horowitzes' and 50% to Oak Creek II, limiting Dimeglio's ability to make decisions. *See* Horowitz Decl., ¶ 14; Pl.'s Mot. Summ. J. [#107-3], Ex. 55.  Eventually, Dimeglio, as "Manager," bought out the Horowitzes share, using money from Triton subsidiaries to pay off the majority of the loan and obtain new financing. *See* Horowitz Decl., ¶ 41; Pl.'s Mot. Summ. J. [#107-3], Exs. 56, 57, 58, 59, 64.  He personally guaranteed the new loan on the Congress Property with Franklin Bank.  *Id.*, Exs. 57, 61, 62.  He then pledged the property as collateral for the Triton Sports Center.  *Id.*, Ex. 73.  This lien was later released by the receiver, enabling Dimeglio to sell the Congress Property.  *Id.*, Ex. 75.

Considering the total dealings of Oak Creek II and Dimeglio (along with Oak Creek Management), the summary judgment evidence shows Oak Creek II was Dimeglio's alter ego.  He created this entity to raise money from wealthy investors, and he guaranteed high yield returns. Instead of investing the funds as he represented in properties in order to "flip" them for profit, he paid large management fees while initially returning about 10% of investors' capital.  This pattern of behavior is typical to a traditional Ponzi scheme.  The existence of the alter ego relationship allows for the application of reverse veil-piercing.  Therefore, the Court concludes, based on the

evidence in the record, the Bridgepoint Note, payable to Oak Creek II, should be treated as Dimeglio's property as well, and the Government's lien attaches to the Bridgepoint Note.

### v.      Actual Fraud for Dimeglio's Direct Personal Benefit

To pierce the veil of an LLC, there must be proof the defendant used the LLC to perpetrate actual fraud for the defendant's direct personal benefit where actual fraud means "involving dishonesty of purpose or intent to deceive." The facts described above, which the Court does not repeat here, provide ample support for the finding Dimeglio perpetrated actual fraud on the Oak Creek II investors for his own direct personal benefit. This finding allows for the piercing of Oak Creek II's veil, and the judgement against Dimeglio may be enforced against the Bridgepoint Note.

Therefore, the Court concludes the Government is entitled to summary judgment.

### 4.      Alternatively, a Turnover Order is Appropriate Given the Connection between Triton and the Congress Property

In the alternative, the summary judgment evidence indicates a substantial portion of financing used to pay for the Congress Property and which is now captured by the Bridgepoint Note came directly from Triton assets. Specifically, Triton was heavily involved in the refinancing of the Congress Property when Oak Creek II acquired the Horowitzes' 50% share.

The Court may issue a turnover order pursuant to the FDCPA. Although turnover orders are not among the remedies expressly contained in the FDCPA, § 3003(b) provides the FDCPA shall not be construed to limit the Government's right under state law to collect a restitution judgment in a criminal case. Under Texas Civil Practices and Remedies Code section 31.002, the Court may issue a turnover order to a judgment creditor seeking to reach property of a judgment debtor.

-18-

Triton played an important role in the refinancing of the Congress Property. The address on one of the deeds lists "Triton Financial, 7035 Bee Cave Road, Suite 200, Austin, TX 78746." *See* Pl.'s Mot. Summ. J. [#107-4], Ex. 65, Doc. No. 2007033288. The address for Oak Creek Realty Fund–II, LLC is shown as 7035 Bee Cave Road, Ste. 200 – Triton Plaza. *Id.*, Ex. 57. The name of David Tuckfield, Triton's attorney, appears for the return address on the 2007 deeds to Oak Creek II. *See id.* [#107-3], Ex. 25 (Testimony of Ty Detmer), at 189:14–16; *id.* [#107-4], Exs. 63, 64, 65. Dimeglio paid off $175,391.05 of the prior $315,000 loan used to purchase the Congress Property with Triton funds. *Id.* [#107-4], Ex. 57. This money was sent via wire transfer from an account at Plains Capital Bank belonging to Rundberg LP in the amount of $59,980 and via wire transfer from an account at Plains Capital Bank belonging to Hidden Springs LP in the amount of $95,020. *Id.*, Ex. 58. Rundberg LP and Hidden Springs LP were both Triton entities. *Id.*, Ex. 59. Dimeglio then obtained the new loan from Franklin Bank in the amount of $155,000, which he personally guaranteed. *Id.*, Exs. 57, 62.

Because of Triton's relationship to the Congress Property and the Bridgepoint Note, the proceeds of the Bridgepoint Note should be used to restore the Triton victims, which actually includes Intervenor Francis. Therefore, in the alternative, the Court issues a turnover order to the Government with respect to the Bridgepoint Note.

C.      **Francis's Motion for Summary Judgment[4]**

Francis has filed his own motion for summary judgment, which the Court construes as a motion to modify the Government's enforcement procedure pursuant to 28 U.S.C. § 3013. In this motion, Francis elaborates on the same arguments made in his "Answer" to the Government's Motion for Summary Judgment [#113]. The Court addresses these contentions together in this section and rejects Francis's arguments.

As an initial matter, the Court notes Francis has failed to provide evidence establishing his interest as an intervening party. More specifically, Francis does not provide evidence establishing he has any property interest in the Congress Property or that he has established any judgment against Dimeglio or Oak Creek II. The Court more fully addresses these concerns below in Part II, and proceeds to address the arguments raised in Francis's motion for summary judgment.

First, Francis contends the Government has not pleaded the necessary facts to invoke federal jurisdiction and contends federal jurisdiction may not be assumed under an ancillary theory. *See* Francis's Mot. Summ. J. [#111], at 3 (citing *Peacock v. Thomas*, 516 U.S. 349, 356 (1996)). The Government in this case, however, is enforcing a criminal restitution order. As described above in Part I(B)(1), the Government seeks to garnish the Bridgepoint Note pursuant to the FDCPA. The FDCPA "provides the exclusive civil procedures for the United States to recover a judgment on a debt," 28 U.S.C. § 3001(a)(1), and its purpose "is to create a comprehensive statutory framework for the collection of debts owed to the United States government [and to] improve the efficiency and

---

[4]As described below in Part II, the Court GRANTS the Government's motion to dismiss Intervenor Francis's claim for failure to establish an interest in the Bridgepoint Note or a legally enforceable judgment against Dimeglio, Oak Creek Management, or Oak Creek II. In the alternative, assuming Francis's claims were not dismissed on these grounds, the Court addresses Francis's motion for summary judgment (construed as a motion to modify the Government's enforcement procedure), and DENIES Francis's motion for the reasons described in this subsection.

speed in collecting those debts," H.R. Rep. No. 101-736, at 32 (1990).  The Seventh Circuit, in rejecting a similar argument, explained:

> appellants contend that under *Peacock v. Thomas*, 516 U.S. 349 (1996), federal courts cannot collect debts by piercing the corporate veils of judgment debtors.  This is a considerable overstatement, for *Peacock* dealt with a new suit rather than an effort to collect a judgment under the ancillary jurisdiction as part of the original suit.  *See Wilson v. Chicago*, 120 F.3d 681, 683–84 (7th Cir.1997); *Citizens Elec. Corp. v. Bituminous Fire & Marine Ins. Co.*, 68 F.3d 1016 (7th Cir.1995).  The Court "has approved a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the pre-judgment avoidance of fraudulent conveyances." *Peacock*, 516 U.S. at 356.  Here, too, the prevailing party is trying to enforce its judgment through additional proceedings in the original case.  But this is by the by, for the United States does not need to proceed under ancillary or supplemental jurisdiction.  The United States *always* gets to litigate in its own courts.  *See* 18 U.S.C. § 3231, 28 U.S.C. § 1345.  Any effort to collect a debt due to the United States presents a claim under federal law, although state law may supply the substance of that federal law.  *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979).  Federal jurisdiction therefore is secure.

*United States v. Vitek Supply Corp.*, 151 F.3d 580, 585–86 (7th Cir. 1998).  For these same reasons, the Court rejects Francis's jurisdictional argument in this case.

Second, Francis argues the Government cannot establish Dimeglio's ownership of Oak Creek II and asserts the various investors in Oak Creek II, including Francis, are the owners.  As described at length above, however, Dimeglio does have a property interest in Oak Creek II.  Dimeglio was the sole owner and operator of Oak Creek Management, the "Managing Member" of Oak Creek II.  As "Managing Member," Dimeglio was entitled to, among other economic benefits, management fees and 50% of the profits generated.  A membership interest and an economic interest in an LLC is personal property.  TEX. BUS. ORGS. CODE § 101.106.  Dimeglio describes himself as the "general partner" of Oak Creek II in his Response to this garnishment action.  Moreover, as described above, Dimeglio, Oak Creek Management, and Oak Creek II were one and the same.  Dimeglio controlled

and operated Oak Creek II's assets entirely by himself. He rolled these assets over into the Triton scheme. He pledged the Congress Property as collateral on Triton acquisitions, and he signed the deed of trust as the "sole member" of Oak Creek II. *See* Gov't's Resp. [#115-1], Ex. A, at ATC 000193, 000200, 000202. He personally guaranteed the refinancing on the Congress Property. The Court rejects Francis's contention that the Government has failed to establish Dimeglio's interest in Oak Creek II and its assets.

In a related argument, Francis contends the Government, in order to succeed on its reverse veil piercing theory, must establish Dimeglio had an ownership interest in Oak Creek II under the Fifth Circuit's decision in *Zahra Spiritual Trust v. United States*, 910 F.2d 240 (5th Cir. 1990). As described above, the record shows Dimeglio, as the Managing Member through Oak Creek Management, had a membership interest, an economic interest, and therefore a property interest in Oak Creek II. The Court finds the Government has satisfied the requirements of *Zahra* and has established Dimeglio's interest in Oak Creek II sufficient to disregard the corporate fiction and apply reverse veil piercing.

Finally, Francis argues the Bridgepoint Note has nothing to do with the Triton scheme, which is what actually gave rise to the criminal convictions and restitution judgment, and "Plaintiff has made no allegations that the single promissory note at issue was entered into in order to avoid liability for the restitution judgment." *See* Francis's Mot. Summ. J. [#111], at 9. The Court fails to see Francis's point. The Government is attempting to establish Dimeglio's property interest in the Bridgepoint Note for the purposes of collecting on the restitution judgment. The Court fails to understand why the Bridgepoint Note must relate to Triton scheme, which is the source of the judgment. Nevertheless, the record establishes Oak Creek II's assets—and the Congress Property

-22-

specifically—were rolled into the Triton scheme.  As described above in Part I(B)(4), when the Congress Property was refinanced and all interests were conveyed to Oak Creek II, Triton Financial was heavily involved.  Accordingly, to the extent Francis's claim that the Bridgepoint Note has nothing to do with the restitution judgment is relevant, it is not factually supported in the record.

Therefore, and in the alternative, Francis's motion for summary judgment, which the Court construes as a motion to modify the Government's enforcement procedure, is DENIED.

## II.   Motion to Dismiss—Rule 12(b)(6)

The Government has moved to dismiss Intervenor Francis's claims on the ground Francis cannot demonstrate any ownership in the Bridgepoint Note.

## A.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  In deciding a motion to dismiss under 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).  However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).  The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although a plaintiff's factual allegations need not establish the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," that must be performed in light of a court's "judicial experience and common sense." *Id.* at 679. In deciding a motion to dismiss, courts may consider the complaint, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**B.     Application**

**1.     The Court has Jurisdiction over Francis's Claim**

As a procedural matter, whether third party intervention in a garnishment proceeding like this one is appropriate is not altogether clear. District courts may entertain civil garnishment and other collection proceedings as post-judgment remedies within an underlying criminal case; nothing precludes the Government from initiating a collection proceeding under an existing criminal docket number in order to collect a fine or restitution ordered as part of the criminal sentence. *See United States v. Kollintzas*, 501 F.3d 796, 800–01 (7th Cir. 2007). In addition to the judgment debtor, the Government is required to provide notice to any person who may have an interest in the property it targets for collection proceedings under the FDCPA. *See* 28 U.S.C. § 3202(b)–(c). The Government, in this case, contacted some of the Oak Creek II investors to further investigate and provide notice. On October 26, 2012, Mark J. Francis filed a Motion to Intervene, claiming he was entitled to $115,000 from the sale of the Congress Property. The Government did not oppose

Francis's intervention, and the Court granted Francis's motion as unopposed. *See* Order of Dec. 6, 2012 [#76]. This Court notes, as others have, there is no provision in the Federal Rules of Criminal Procedure for intervention by a third party in a criminal proceeding, and intervention in civil proceedings is governed by Federal Rule of Civil Procedure 24, which does not apply in a criminal case. *See Kollintzas*, 501 F.3d at 799. Nevertheless, the Court concludes it has jurisdiction to address Francis's claims as an intervenor in this garnishment proceeding. In the alternative, Francis is an "interested person" under 28 U.S.C. 3202(c) and asserts he is a co-owner under 28 U.S.C. § 3010. The Court has authority under the FDCPA to address Francis's claim.

## 2.    Francis has not Established his Interest or a Judgment

The Court concludes Francis's claim as an intervenor must be dismissed because he has not established his interest in the Bridgepoint Note, and he has failed to establish—or even pursue—a judgment against either Dimeglio, Oak Creek Management, or Oak Creek II.

The record shows Francis and the other Oak Creek II investors bought fraudulent "units" in Oak Creek II. Francis's father gave Dimeglio $110,000 in 2003 and 2004 to be a limited partner in the Oak Creek II LLC. *See* Mot. Intervene [#69], at 32. How this money was spent exactly is unknown, but the summary judgment evidence demonstrates Dimeglio did not spend the investor money the way he said he would. In particular, Dimeglio represented he would spend 75%, or roughly $750,000, on the acquisition of properties, and 17.5%, or roughly $175,000, on management fees. Instead, Dimeglio raised roughly $975,000, and spent at least roughly $775,373 on management fees. To what extent Dimeglio spent Oak Creek II funds on property acquisition is not clear, but it appears only a small amount could have been directed toward the Congress Property purchase, which had a purchase price of $450,000 and was financed mostly through a $315,000 loan,

money from the Horowitzes who were not members of Oak Creek II, and $50,000 from an Oak Creek account.  The Horowitzes also owned a 50% interest in the Congress Property, and when this interest was conveyed to Oak Creek, the Congress Property was refinanced, largely with Triton funds and a new loan personally guaranteed by Dimeglio for $155,000.  Francis's claim as an intervenor to an interest in the Congress Property (and the Bridgepoint Note) of $115,000 cannot be supported.

Moreover, Francis's father was a limited partner in the Oak Creek II operation who invested his money after being expressly warned any return on this investment was not guaranteed, and he should expect and be able to lose all of the investment.  CPP Memo, at Cover 7; *id.* at 8. He, along with the other investors, gave Dimeglio exclusive authority to do as he pleased with their money, and Dimeglio returned their trust by defrauding them of their investment.  Apparently, Francis and other investors did not even realize their losses or the fact Dimeglio was in prison until this garnishment action.  Upon notice, Francis responded by filing a pro se motion to intervene in an attempt to collect on his father's investment in Oak Creek II.  Francis apparently has not, however, pursued any sort of action against Dimeglio, Oak Creek Management, or Oak Creek II to establish a judgment which might give him priority as a creditor.  He has had plenty of time to do so considering he intervened in this case in October 2012.  By contrast, the Government has obtained a restitution judgment against Dimeglio and now seeks to garnish the Bridgepoint Note.

The reality is Francis's father invested—seemingly innocently—in Dimeglio's fraudulent Oak Creek II scheme.  Because Dimeglio blended much of Oak Creek II's assets into Triton's, Francis is listed as one of Triton's victims in the judgment against Dimeglio. Francis, though, cannot establish his interest in the Congress Property or the Bridgepoint Note, and he has not obtained a legally enforceable judgment to compete with the Government's in this garnishment action.

Therefore, the Court must GRANT the Government's motion to dismiss Francis's claim in this action.

### Conclusion

Accordingly,

IT IS ORDERED that Plaintiff United States of America's Motion for Summary Judgment [#107] is GRANTED;

IT IS FURTHER ORDERED that Plaintiff United States of America's Motion to Dismiss [#110] is GRANTED;

IT IS FURTHER ORDERED that Intervenor Mark Francis's Motion for Final Summary Judgment [#111] is DENIED;

IT IS FURTHER ORDERED that Intervenor Mark Francis's claims in this garnishment proceeding are DISMISSED;

IT IS FURTHER ORDERED that Oak Creek Realty Fund-II, LLC was the alter ego of Defendant John Dimeglio;

IT IS FURTHER ORDERED that Oak Realty Fund-II, LLC was used by Defendant Dimeglio to perpetrate actual fraud for his direct personal benefit;

IT IS FURTHER ORDERED that based on Texas's veil-piercing doctrines, including reverse veil-piercing, the limited liability of Oak Creek Realty-II, LLC may be pierced and Defendant Dimeglio's liability imposed on the assets of the LLC, which is also Defendant Dimeglio's property;

IT IS FURTHER ORDERED that the Government's lien attached to the Bridgepoint Note;

IT IS FURTHER ORDERED that the United States may enforce its restitution judgment lien against the Bridgepoint Note;

IT IS FINALLY ORDERED, in the alternative, that a substantial portion of the Bridgepoint Note proceeds are traceable to Triton Financial and subject to turnover pusuant to § 3003(b) of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001, *et seq.*, and Texas Civil Practice and Remedies Code § 31.002 for application toward Defendant Dimeglio's restitution judgment.

SIGNED this the ___30___ day of April 2014.


SAM SPARKS
UNITED STATES DISTRICT JUDGE